Case number 14-7041, GSS Group Ltd. Also known as Global Security Seals Group Ltd. Appellant v. National Court Authority of Liberia et al. Mr. McDormand for the Appellant, Ms. Szysdat for the Appellees. Good morning. May I please the Court? Let's wait until the courtroom is clear. All right. Good morning. Thank you. Good morning. May I please the Court? Stan McDormand for the Petitioner. A petition to confirm an arbitration award against the Republic of Liberia. It's a claim that we say is governed by the BANSEC rationale. BANSEC, in turn, was applied by this Court in the Transamerica case. And the instant case arises in the shadow of Transamerica. And it is our case that on both the principal and agent ground, or theory, there is cause to impose the liability reflected in the arbitration award against Liberia. And equally, under the alternative equity test, in the injustice test, which also arises out of BANSEC. Now, Transamerica says that you can't pierce when the government is acting as a regulator. Why doesn't that doctrine apply here? Well, first of all, the Court in Transamerica was not addressing the equity standard of BANSEC. It was addressing the principal and agent test. And what I would suggest, Your Honor, is that what this Court did in Transamerica is chart out two alternatives in respect of principal and agent. One was complete domination. The other, the second, the one which is material to this case, is when the sovereign exercises its control in a way that overrides the conduct of the government. But it's not control. The point of the case is it's not control when you're acting as a regulator. I think it's more of a... I think the control test is independent of whether it was acting as a regulator or not. What the Court did in Transamerica, quite correctly, is impose the four-factor test for agency-principal relationship. And we meet all four of these criteria. The first is that the parent has manifested its desire for the subsidiary to act on the parent's behalf. Well, let me ask you, under the U.N. peace plan setting up this transitional government, isn't what happened here precisely what the plan called for? Namely, there was a public corporation established as the port authority. But this contracts and monopoly commission was overseeing contracts. And so the contract was initially submitted to the transitional government that said, hold up, you have to go through this contract and monopoly commission and follow their requirements. Which they did. Exactly. And then this international group brought to the transition government's attention its concern about this contract. And at that point, the transition government notifies the port authority to reject the contract. In other words, all I'm trying to get at is, in this context, isn't this a classic situation of regulation as opposed to principal and agent? No, exactly the opposite, if I may, Your Honor. All right. Because this is a case where the regulator, the CMC, the Contract and Monopolies Commission, exercised its jurisdiction. The district court did not tell the full story. When the international contacts group mentioned its concerns over the contract, and this international contacts group is more in the nature of an NGO. It's not anything officially connected with the Liberian government. But it was by its letter of 19th October. It's in the record. It's at 918. They alerted Chairman Bryant, the head of the government, to their concerns over the contract. And the very next day, Chairman Bryant inquired of the CMC. This is not in the district court's opinion, but it's in the record at 927. It asked the CMC, the regulator, to address the three concerns raised by the international contacts group in its letter. And on October 27th, also not in the district court's opinion, but in the record at 932, the CMC, the regulator, responded to the inquiry from Chairman Bryant, gave its reasons why, in its opinion, all three grounds cited by the international contacts group were incorrect, and stood by its decision to approve the contract. All right, but what I'm getting at is why wasn't the public corporation arrangement as set up in this transitional government consistent with the process that happened here as distinct from a principal agent? I mean, I thought the district court's point and Transamerica's point and Panchak's point was there wasn't this day-to-day control. The Port Authority was moving ahead, entering contracts, making arrangements, but this commission was overseeing everything. But the differentiating fact, I would suggest, Your Honor, is that the government stepped in and directed the NPA to cancel the contract. And that is the exercise of control that we say passes the principal and agent test. Because if you go back to this court's iteration of the four factors, what is important is that there be something more than simply the institutional relationship between parent, state of Liberia, and agent, the National Court of Liberia. It's not simply dominating the board of directors. It's not the institutional control that a parent, such as the state of Liberia, might have indirectly over its agency. What you have here is the actual exercise of control, the direction to cancel the contract. This is a slightly separate point, but doesn't it have to be controlled at the time of the contract formation? No, I think it's controlled at the time of the harm. And if the control here, the decision to cancel, provokes the harm, then that is the important test. And how do you link that up to the text of the statute? The text of the statute, I think the answer to that, it goes into the rebuttable presumption of separateness. If you can't rebut the presumption, then there is no basis for jurisdiction over the state under the FSIA. But, in contrast, if grounds do exist to rebut the presumption, then there is jurisdiction under the FSIA. And that's what the 11th Circuit held in the Assin-Davis case, which the court can find at 218 Federal 3, 1290, page 1302. The point being that if you overcome the presumption, you establish jurisdiction. That's our case. I think I took you away from, you were trying to argue, or want to argue also, the equitable... Yes, because our case has two prongs. First, principle agent, principle, control, we satisfy that, we say. But if we don't, if we don't, BANSEC has the equitable alternative, injustice. The district court, in its opinion, treats that equity prong, I wouldn't say dismissively, but very narrowly. Equity is an expansive concept. Equity exists to rectify harm, better to prevent harm. What is the harm here? The harm is allowing the Republic of Liberia, having directed the cancellation of the contract, having directed the breach of the contract, to evade responsibility for the damages which the breach of the contract caused. So you think the court should basically ignore this governmental structure where all these events are occurring, because your client responded to the transition government's concerns and renegotiated parts of the, not renegotiated, but changed some of the terms of the contract. So it was fully aware that the transition government was involved in this in a way such that the decision to be made here was not strictly subject only to the port authority's approval. It was aware, Your Honor, that the CMC, the regulatory oversight body, was closely involved in the approval of the contract. And in fact, in October, the CMC, on August the 12th, informed the NPA of its approval. But even more so, on August 29th, in the record at 888, the CMC informed GSS, the contract party, of its authorization for the contract. An authorization, if I may add, excuse me, that it reinforced directly in response to Chairman Bryant's invitation on October 27th. So they changed their minds. No. The transition government changed its mind when it looked at this contract. Chairman. And it made a determination that this contract was not good. Chairman Bryant, on behalf of the state, overrode the authorization granted by the CMC and directed the cancellation of the contract. And we say that proves that it was the principle dominating its agent, the NPA. If, Your Honor, if, Your Honor, the defense would have been that Chairman Bryant was acting lawfully pursuant to his statutory powers, acting as a regulator, that was a defense that should have been raised in the arbitration. It was open to the NPA, of course, to defend against the arbitration. I know you make that argument. So is your position now that Liberia is limited to showing that there was fraud during the arbitration proceedings? No. For Liberia, if the court confirms, if the award is confirmed against Liberia, then, or if the case is remanded, I should say, to permit an adjudication of whether the award should be confirmed against Liberia, then Liberia can raise the defenses that the New York Convention allows to any court. That's right. So I'm thinking about them like fraud. I mean, they're very limited. They are limited. Public policy, public policy is the one that has been cited in the past by Liberia. Right. So it is open to Liberia, if the case is remanded, to demonstrate that this award should not be confirmed on public policy grounds, among other things they could raise, this question of regulation. Now, we may not think that it passes muster under the public policy exception, but the day in court will come. The opportunity for Liberia to contest the enforcement of the award against it is not precluded. That remains open. But the case has to be remanded for that adjudication to take place because the presumption of separateness has been rebutted. If I may reserve time. We'll give you a couple minutes in reply. Sinzak. May I please the court? Colleen Sinzak for the National Port Authority and the Republic of Liberia. To begin, just to clarify, in order to enforce this arbitration award against the Republic of Liberia, it is necessary for GSS to travel through an exception to the Foreign Sovereign Immunities Act. And the exception that they are urging is the arbitration agreement exception. But that exception is only for a sovereign that has made an arbitration agreement. And here, the problem is that Liberia simply had never made an arbitration agreement. What about commercial activities? They are not traveling under that. And I think because there's actually no activity in the United States and there's no direct effect on the United States. As this court is aware from the first hearing, there's not even minimum contacts between the National Port Authority and the United States. So that simply isn't open to them. But I'm just saying as to Liberia. As to Liberia, again, the commercial activity exception requires there either to have been commercial activity within the United States or a direct effect on the United States. But there's no allegation that any of the conduct occurred in the United States. Neither of the parties is a United States entity. So you're saying we should only look at the exception that GSS has invoked, namely the arbitration? Yes, for a reason that you just mentioned, which is that they've only attempted to travel through the arbitration exception, but also because the commercial activity exception simply isn't available to them. All right. So the district court took the position that to be principal and agent, you have to have essentially day-to-day control. That's correct. And the argument the district court rejected was a one-time control is not enough. It rejected that in part because of the particular time that GSS was attempting to point to. Again, to travel through the arbitration exception, it would need to be demonstrated that the National Port Authority was acting as Liberia's agent at the time the arbitration agreement was made. Right. All right. So I think there's something in the record from which namely the Port Authority's response to the government's directive that the contract should be canceled, suggesting that there was this, quote, control at the beginning. So how do you respond to that? In other words, that the government, the transition government was involved in this matter from the beginning. The letter in question, I believe, simply informs the – Well, they submitted the contract to the transition government. The government said, hold up. You've got to go through the contracts and monopoly commission, and then you've got to follow their regulations. And so then the authority came back and said, we've done that. So, I mean, that's the government involved from the beginning, isn't it? I think that that's a mischaracterization. The government certainly – Any of my facts wrong? In the following way. The contract – pardon me. After the contract was signed, the contracts and monopoly commission did say to the National Port Authority, wait, we need to approve this contract. Now, that, again, is government acting as regulator. That's saying there are certain regulations and laws that apply to public contracting, and we need to make sure you met them. And, of course, in this case, they hadn't because they had not submitted the contract for open bidding. So it's not that the government was involved from the beginning in terms of directing the National Port Authority to enter into this contract on behalf of Liberia, which is what GSS needs to approve. So when they approve the sole source contract, that is just complying with the laws distinct from – Precisely. And it's the Liberian laws and regulations with respect to public contracting. And it's very analogous to what happened in Transamerica, where the Venezuelan government had approved three sales of shipping vessels. And the plaintiffs in that case were attempting to urge that that was evidence of control. And this court said, no, that's evidence of a standard regulatory action being taken by a government, not a principal-agent relationship. And that's what we have here. I mean, I get the two extremes, all right? And the question for me is, where is this case, given the governmental construct that we have here? And you've heard what counsel has said and you've read his brief. Why is it – in other words, what's your understanding and interpretation of what the transition government's powers were vis-a-vis this contract? Their powers were the powers of any government, including the United States, which is to ensure that laws and regulations are being enforced. But here the government says, we don't like the contract. We don't think it's a good deal. I think, as this court actually said the first time around, the government directed the cancelling because the contract was null and void ab initio, because it failed to comply with open bidding requirements. Two reasons. The first paragraph was, it's not a good economic deal. Second is the legal argument. And it did rely in part on the legal argument. And I think that's very important. The district court said that this looked more in the nature of a regulatory action. And I think it's also important to remember that even that first argument, all of this is coming directly from the international contact group of Liberia, which is the international group that was charged with ensuring that the rule of law took over in Liberia and of moving away from the prior corruption system, which was away from the rule of law. And so I think that the very fact that the government is acting because of it has been informed by this contact group established to ensure compliance with the rule of law suggests that what the government is trying to do is comply with its own rules and laws. I gave two reasons, as I've said. And one had nothing to do with that. No, actually, when the international contact group of Liberia sent a letter to the national transition government, it actually mentioned three different reasons. No, I understand. I understand that. But we can't ignore the other reason. You want the court to read it that it didn't think the contract was a good deal and it thought if there was competitive bidding, they might end up with a better contract. That's certainly one interpretation. It's also worth remembering that it's not just that they said this isn't a good deal. It's that it was a vastly lopsided contract, which they took as an indication correctly that it was the result of corruption. So hiding in the background here is the fact that this contract was, as affidavit submitted indicated, a result of bribery. And so the international contact group was not charged with just making sure that Liberia got a good deal in its contracting. It was charged with ensuring that the rule of law took the place of corruption. And so when it said not this isn't a good deal, but that this is a grossly lopsided contract, the clear indication is this is not a contract that resulted from the appropriate rule of law open bidding procedures that it should have. How do we deal with the equity exception? What does that mean? The equity exception, I think, is being misused by GSS in this case. As it came up in Bankek and then again in Braidis, which they rely on, it's not a question of whether the sovereign might have been involved in the underlying breach. It's a question of whether the sovereign has taken actions to abuse the corporate form in order to avoid liability. So, for example, in Braidis, which again is the main case GSS is citing, there had been an oil contract with an instrumentality of Turkmenistan. And after a breach of the contract, the Turkmenistan government emptied the instrumentality of all assets. It moved oil and gas assets into a separate account, which it declared judgment proof. And then it began this sort of shell game in which it created a series of other instrumentalities. That's the kind of abuse of the corporate form, the kind of abuse of an instrumentality to avoid liability that the equity prong is designed to respond to. Not simply an allegation that the government might have been involved in a breach of contract. Again, the exception in play is the arbitration exception, not an exception for a potential breach of contract. So by abuse of the corporate form, you're limiting that to, as I read your brief, the situation where somehow here Liberia benefits. There's an attempt to escape liabilities for some asserted underlying wrong. So the language that's used in Bankak is there needs to be some sort of fraud or injustice. And in particular, the Bankak court says it needs to be a fraud or injustice, often that violates the law or policy of the United States or another country. Here, that's not the case. The reason that GSS has been unable to pursue the arbitration award against the National Port Authority isn't because of any machinations of Liberia. It's because of the garden variety functioning of the United States personal jurisdiction requirements. And that simply isn't an equitable issue. Can I ask you, before you sit down, I think one reason Liberia didn't get involved in the arbitration proceeding was something, court proceedings were going on in Liberia. I know it's not in the record, but what's the status of? Based on those court proceedings, which were actually lodged by Liberia against the National Port Authority and GSS, which is another demonstration of the separation between the sovereign and the National Port Authority, those proceedings determined that the contract was null and void and couldn't be enforced. Okay. Thank you. Okay. Why don't you take two minutes? Yes, thank you very much. To answer your question, Judge Rogers, the cancellation letter, it does in fact have two paragraphs, as you point out. The first deals with the perceived commercial disadvantages of that contract. And it was on that basis that the government canceled the contract. Because, as you point out, the first paragraph expresses the perceived commercial disadvantages. But there are two reasons. Well, no, because he says, I am therefore directing that the contract be canceled. And then he goes on in the second paragraph to express a preference for a competitive bidding contract. But that's a future contract. That's not this contract. This contract, as I say, was in fact approved by the CMC, by the regulator, and it was furthermore the entreaties of the NPA itself in its January 3 response to the cancellation letter to point out that in fact the contract had received the blessings, if you will, of the CMC. That is the answer that we say. And this is what Lloyd Mustle, the arbitrator in London, focused on. He said a commercial disadvantage is not grounds to cancel a commercial contract. And it wasn't. And that's why there was a liability award against the NPA. That's why there was a damages award. And that's why Liberia has to answer today for the damages that its directive provoked. Equity is not confined to abusing the corporate form as if this is a narrow concept. Equity, as I indicated earlier, is broad. And what Liberia is trying to do here is to use its perceived sovereign immunity as a shield, to shield itself against the damages that its conduct, its cancellation of the contract provoked. And equity fits these circumstances. And I would urge the Court, with respect to the alternative principal and agent ground, it is sufficient for this single act, the cancellation of the contract, to demonstrate the principal-agent relationship for purposes of this contract in this case. And that is all that is required. And your best case on that is? The authority, if the Court would go back and look at S and Davis International, that is also authority for the fact that a deliberate breach of the contract takes the principal and agent relationship out of the norm. Thank you very much.
judges: Henderson, Rogers, Kavanaugh